IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

PATRICK TATE,

                Plaintiff,

  v.

JOHN DOE, *et al.*,

                Defendants.

OPINION and ORDER

20-cv-704-jdp

---

    Plaintiff Patrick Tate brought this civil rights action under Section 1983, alleging that he was sexually assaulted on multiple occasions while incarcerated at Fox Lake Correctional Institution (FLCI). Plaintiff named several defendants,[1] whom he alleges failed to protect him from the risk of assault. He has also named a "John Doe" defendant as a placeholder for the unidentified perpetrator of the alleged assaults.

    Plaintiff alleges that he was drugged and unconscious during the assaults and thus cannot visually identify the perpetrator. He seeks to identify the Doe defendant using a partial DNA profile developed from DNA recovered from the underwear plaintiff was wearing during one of the alleged assaults. This profile was entered into a database containing the DNA profiles of all FLCI inmates at the time, and none matched, so plaintiff reasons that a prison staff member must be the perpetrator. After obtaining additional discovery and reviewing staff schedules, plaintiff narrowed his search to two correctional officers who plaintiff believes were working and had access to plaintiff's cell during two of the alleged assaults.

---

[1] The named defendants are Bruce Siedschlag, PREA Investigator at FLCI, Randall Hepp, Warden of FLCI, Mark Schomisch, Security Director at FLCI, and E. Devries, C. Wiersma, and J. Szweda, staff members at FLCI. Dkt. 28.

Plaintiff now moves under Federal Rule of Civil Procedure 35, which provides for the compelled physical examination of parties in civil discovery, asking the court to order the two officers to submit to buccal swabs for purposes of generating their DNA profiles. Plaintiff proposes to compare the officers' DNA profiles to the partial DNA profile recovered from plaintiff's underwear to see if either matches.

Plaintiff's plan has logical appeal, but there is a threshold question as to whether Rule 35 authorizes courts to order nonparties to submit to such examinations. Considering the origins, development, and operation of Rule 35, as well as the facts of this case, the court finds it lacks authority to order the nonparty officers to submit to physical examinations and thus DENIES plaintiff's motion.

BACKGROUND

The court begins by recounting plaintiff's allegations. Next, it discusses the DNA sampling and analysis that has occurred. Finally, the court provides the procedural history of this lawsuit up to the present motion.

A. Plaintiff's allegations[2]

1. The alleged assaults

In March 2016, plaintiff was transferred to FLCI and assigned a cell with another inmate. Dkt. 28 at 9. About two months later, plaintiff prepared a meal, brought it to his cell, and then left to shower. *Id.* Plaintiff returned, ate his meal, and, about forty minutes later, began to feel drowsy and fell asleep. *Id.* At about 4 a.m. the next morning, plaintiff awoke and

---

[2] The court recounts these allegations to provide context for this discovery motion; it is not finding any of the facts to be true or undisputed.

2

"felt wet and greasy on his bottom," though he disregarded the sensation, figuring it was merely sweat. *Id.*

On or about September 11, 2016, plaintiff had a similar experience.[3] *Id.* During early morning, after sleeping deeply for four to five hours, plaintiff awoke in a stupor unable to move. *Id.* at 9–10. Despite his physical incapacity, plaintiff could see and was otherwise aware of multiple people around him but was unsure what was occurring. *Id.* The next day, plaintiff overheard inmates saying, "he be knocked out, you can do whatever you want," "he can't feel nothing," and "he don't remember nothing." *Id.* at 10. Suspecting himself of being a victim of ongoing abuse, plaintiff began to document the nature and date of these events.[4] *Id.*

On October 5, 2016, plaintiff again prepared a meal and left it in his cell while he went to shower. *Id.* Plaintiff put on new, never-worn underwear and then ate his food, became drowsy, and fell asleep. *Id.* At some point in the night, plaintiff became aware of people around him but was unable to fully gain consciousness. *Id.* Later, between 4 and 5 a.m. the next morning, plaintiff awoke "wet and . . . sore at his rear," noticing "grease stains on his underwear." *Id.* Plaintiff placed his underwear in a paper bag and kept them in a drawer to preserve them. *Id.*

### 2. Investigation into the assaults

On or about October 7, 2016, plaintiff reported the incident to Seargent Ellis, who contacted Captain Scheuler. *Id*; *see also* Dkt. 48-2 (DOC incident report noting the plaintiff's

---

[3] A few days after the September incident, plaintiff retroactively marked the date of the incident on his calendar as either September 11 or 12, unsure of the actual day on which it occurred. Dkt. 48-1 at 2–3.

[4] As noted below, there is confusion concerning this date.

initial report of the incident to prison staff on October 7, 2016). The next day, plaintiff told Scheuler about the incidents and turned over the underwear requesting that they be tested for evidence. Dkt. 28 at 10. The report memorializing these meetings referred to the incidents generally and did not specify their dates. *See* Dkt. 48-2 at 2 (noting generally that when plaintiff "goes to bed his shorts are clean, and upon waking his shorts will have stains and are damp").

After receiving no follow-up for several days, plaintiff requested another meeting with Scheuler, which occurred on October 14, 2016. In the report memorializing this meeting, Scheuler listed the date of the incident as the morning of October 7, 2016. Dkt. 48-4. Apparently relying on this report, prison officials preserved video footage from the early morning hours of October 7. Dkt. 48-4. They did not preserve video footage from October 5 or October 6. *Id*. In his report, Scheuler noted that video footage from the morning of October 7 showed no one entering plaintiff's cell, *id.*, which was relayed to plaintiff at some point. *See* Dkt. 48-3 at 4 (investigation report quoting plaintiff as saying, "The cameras show nobody came into my room that night[.]").

On October 18, 2016, plaintiff reported the incident to the Prison Rape Elimination Act (PREA) hotline. Dkt. 48-3. During an October 21, 2016, interview with the PREA investigator, plaintiff reportedly described the incident occurring on "Thursday night October 6th." Dkt. 48-3 at 4. On October 27, plaintiff reached out to the PREA investigator again and expressed his belief that his cellmate was the perpetrator based on the video footage.[5] *Id.*

---

[5] Plaintiff reasoned it must be his cellmate because "[t]he cameras show[ed] nobody came into [his] room that night, it had to be him." Dkt. 48-3 at 4.

4

The PREA investigator reached out to Scheuler, who gave the investigator plaintiff's underwear. *Id.* at 5. Plaintiff again followed up with the PREA investigator on November 11, 2016. *Id.* Shortly afterwards, on November 15,[6] the PREA investigator gave plaintiff's underwear to Dodge County Detective Stiemsma to have it analyzed for DNA. *Id.*

Running parallel to the PREA investigation, plaintiff filed a request to swear a criminal complaint in Dodge County Circuit Court in April 2017. Dkt. 48-5. In his letter to the court, plaintiff explained that he attempted to contact the Dodge County District Attorney's Office and the Wisconsin Department of Justice but received no responses. *Id.* The matter was referred to the Dodge County District Attorney's Office later the same month. Dkt. 48-6.

### B. DNA testing and results

The DNA Analysis Unit of the Wisconsin State Crime Laboratory analyzed plaintiff's underwear and issued a report on August 14, 2017. Dkt. 48-9 at 2. Swabs from the inside and outside of the waistband and the inside back crotch and seat of the underwear recovered DNA that the Crime Lab determined was a mixture of from two different individuals, one major contributor and one minor contributor. *Id.* The major contributor was determined to be plaintiff himself. *Id.* at 3. The minor contributor was unknown but male. *Id.*; Dkt. 48-11 at 3.

Per the Crime Lab, the probability that a DNA sample of a randomly-selected individual would be consistent with the minor-contributor profile is approximately 1 in 14,000. Dkt. 48-11 at 2. In other words, if DNA samples were obtained from 14,000 randomly-selected

---

[6] The report, Dkt. 48-3 at 5, is dated "11/15/2017," but this appears to be a scrivener's error. The reports are in chronological order and the entry dated 11/15/2017 comes between one dated 11/11/16 and another dated 03/06/2017.

individuals, statistically speaking, we would expect one of those samples to be consistent with the minor-contributor profile obtained from plaintiff's underwear. Applying this to the population of Wisconsin, we would expect samples from 420 individuals to be consistent.[7]

The minor-contributor DNA profile was entered into the Wisconsin Forensic Index of the Combined DNA Index System (CODIS), which contains the DNA profiles of all incarcerated felons in Wisconsin.[8] Dkt. 48-9 at 2. On December 14, 2017, the Crime Lab reported that the minor-contributor sample from the waistband matched the CODIS profile of one John Wilson. Dkt. 48-10. During a follow up investigation into the match, Wilson voluntarily provided a buccal-swab DNA sample. Dkt. 48-11 at 2. The profile developed from Wilson's sample was consistent with the minor-contributor DNA profile obtained from plaintiff's underwear. *Id.*

Yet, further investigation suggests that this was a false positive. Wilson had never been an inmate at FLCI, worked there, visited there, or had any other connection to the facility. Dkt. 48-12 at 2–3. Moreover, Wilson had never worked in a garment or underwear factory and so could not have encountered plaintiff's underwear during packaging. *Id.* Wilson thus appears to be one of the approximately 420 individuals in Wisconsin other than the alleged perpetrator expected to match the minor-contributor DNA profile.

---

[7] This number is provided in plaintiff's briefing. Dkt. 47 at 6, 13. Defendants take issue with the use of Wisconsin's population versus the nation's population, Dkt. 53 at 21–22, but the population picked does not matter—it is merely to illustrate a statistical point.

[8] Unless incarcerated as a felon in Wisconsin at some point, no FLCI staff member would have their DNA profile logged in CODIS, and so the Crime Lab's database search would not be expected to return the profile of a prison employee even if their DNA would in fact match the minor-contributor profile.

On November 3, 2017, the Dodge County Circuit Court informed plaintiff that neither it nor the Dodge County District Attorney's Office believed criminal prosecution was warranted, citing lack of evidence, and dismissed plaintiff's action. Dkt. 48-7. And on November 24, 2017, the PREA investigation concluded as "unsubstantiated," meaning the investigation did not produce sufficient evidence to support a final determination of whether the event occurred. Dkt. 48-8.

## C.  Procedural history

Plaintiff filed this lawsuit unrepresented in July 2020. Dkt. 1. In the original complaint, plaintiff named six defendants, including the one John Doe alleged to have assaulted him in October 2016. *Id.* at 2. In an amended complaint filed before the court issued its order on leave to proceed, plaintiff named ten defendants, including five Does. Dkt. 9 at 2–3. The court considered the first amended complaint operative and granted plaintiff leave to proceed on Eighth Amendment claims against various prison staff for failing to prevent the risk of assault and the five Does. Dkt. 11 at 6–7. One of the Does was the alleged assaulter, and the other four were officers who allegedly failed to protect plaintiff. *Id.* at 5.

Plaintiff then moved to amend his complaint again. Dkt. 19. The second amended complaint named the thirty-six officers who worked third shift at FLCI, claiming one of them must be the Doe who assaulted him. Dkt. 20 at 2. Defendants moved for the court to screen the amended complaint, arguing that plaintiff's strategy of naming every FCLI employee who could be the Doe was unreasonable. Dkt. 22 at 2.

Before the court ruled on defendants' motion, plaintiff filed a third amended complaint[9] that added another named potential Doe for an updated total of thirty-seven. Dkt. 28 at 2.

---

[9] The docket lists this complaint as the "Second Amended Complaint," though it is the third

7

Plaintiff objected to defendants' motion to screen his previous amended complaint as moot, Dkt. 29, and argued he could obtain DNA samples from all named potential Does under Rules 34 and 35, citing various out-of-circuit opinions relating to DNA testing in sexual harassment and wrongful-death cases.[10] *Id.* at 3–4.

The court dealt with all the motions in a single order. Dkt. 34. The court granted plaintiff's motion for leave to amend, Dkt. 19, and held that plaintiff's third amended complaint, Dkt. 28, was operative. *Id.* Plaintiff identified and named three of the five Does he included in his previous complaint as correctional officers who allegedly were aware of a series of assaults at the prison but turned a blind eye to the risk of future assaults. *Id.* at 1. The court granted leave to proceed against these newly-identified defendants. *Id.* at 1–2. The court also granted leave to proceed against the one Doe officer who allegedly assaulted plaintiff and dismissed the unidentified fifth Doe. *Id.* Accordingly, the court denied defendants' motion to screen the complaint, Dkt. 22, as moot. *Id.*

Additionally, the court denied plaintiff's request for Rule 35 examinations to determine which of the thirty-seven officers was the Doe defendant. *Id.* The court explained that, while it would likely allow plaintiff to obtain a DNA sample had he been seeking one from a particular person, the court was unwilling to order DNA samples from thirty-odd people with the goal of identifying a Doe defendant. *Id.* at 3. The case schedule was struck, and the court indicated its intent to recruit counsel for the limited purpose of identifying the Doe defendant. *Id.*

---

amended complaint filed, following Dkts. 9 and 20. The court disregarded the second-filed amended complaint, Dkt. 20, in its order granting plaintiff leave to amend, Dkt. 34 at 1, and so the third amended complaint plaintiff filed was the second amended complaint recognized by the court.

[10] None of the cases plaintiff cited involved Doe defendants.

With the aid of counsel, plaintiff served written discovery requests seeking all photographs, video tapes, or other images depicting plaintiff's cell or cell block on September 10, 2016, October 5 and 6, 2016, and February 10, 2017,[11] but was informed no responsive documents existed. Dkt. 48-15 at 9. Left with the partial DNA profile from his underwear as the sole clue to identifying the alleged perpetrator, plaintiff cross-referenced FLCI staff schedules for male officers who worked during the hours of the alleged assaults. Dkt. 54-4. Plaintiff identified two correctional officers, Ronald Waas and Scott Schulz, who worked on September 11, 12, and October 5, 2016. In October 2024, the court ordered a briefing schedule on the issue of obtaining DNA samples from certain correctional officers to identify the Doe defendant. Dkts. 41, 45.

LEGAL STANDARDS

An extensive search yielded no authority squarely addressing whether Rule 35 allows a court to compel the physical examination of a nonparty for purposes of identifying a "John Doe" defendant. Without the benefit of on-point precedent, the court reviews the common law origins, eventual codification, and current scope of Rule 35.

**A. Common law**

Federal courts have no inherent authority to order a party, let alone a nonparty, to undergo a physical examination in connection with a civil case. The Supreme Court held as much in *Union Pac. R. Co. v. Botsford*, noting "the possession and control of [one's] own person," was among the most "sacred[,]. . . carefully guarded" rights at common law. 141 U.S. 250,

---

[11] The first two dates correspond with the dates of the alleged sexual assaults, discussed above, and the third date relates to an alleged attack on plaintiff by other inmates.

9

251 (1891). Though federal courts lacked inherent authority, the Court acknowledged that a statute may grant courts the authority to issue such an order. *Id.* at 257. And in *Camden and Suburban Ry. Co. v. Stetson*, the Court held federal courts could rely on a state statute to order a physical examination. 177 U.S. 172, 177 (1900).

## B. Rule 35's origins and development

In 1937, the Supreme Court promulgated Rule 35. In relevant parts, and with several conditions, the rule permitted a court to order a party to submit to a physical or mental examination as part of civil discovery. The advisory committee notes to this original version cite *Botsford* and *Camden* to support the rule's constitutionality and list several contemporaneous state statutes permitting physical examinations of parties before trial.

In 1955, the Advisory Committee on Rules for Civil Procedure proposed expanding the scope of Rule 35 to cover "an agent or a person in the custody or under the legal control of a party." Advisory Committee on Rules for Civil Procedure, Report of Proposed Amendments, 41–43 (1955) (*quoted in Schlagenhauf,* 379 U.S. at 116 n. 12). However, the 1970 amendments to Rule 35 adopted only a portion of the proposal, extending coverage to "a person in the custody or under the legal control of a party," Fed. R. Civ. P. 35(a), but not to "an agent of a party," *see Schlagenhauf,* 379 U.S. at 116 n. 12. This limited approach conformed with the Supreme Court's holding in *Schlagenhauf v. Holder*, 379 U.S. 104, 115 (1964), which held that Rule 35 applies only to parties.

Since then, courts have construed the application of Rule 35 narrowly. For example, courts have ruled that parents or guardians of children, suing in in their representative capacity, are not subject to Rule 35 because they are neither parties nor in the custody or under the legal control of their child. *Caban ex rel. Crespo v. 600 E. 21st St. Co.*, 200 F.R.D. 176, 179 (E.D.N.Y.

May 17, 2001); *Cutting v. United States*, No. 07-CV-02053-PAB-MEH, 2008 WL 5064267, at *1 (D. Colo. Nov. 24, 2008).

C.  **Current scope of Rule 35**

Today, a court may rely on Rule 35 to compel a party or a person within a party's custody or legal control whose mental or physical condition is in controversy to submit to a physical or mental examination. Fed. R. Civ. Pro. 35(a)(1). The order may issue only for "good cause," *id.* at (a)(2)(A), which requires a "greater showing of need . . . than under other discovery rules." *Schlagenhauf*, 379 U.S. at 118. To prove good cause, a movant must "affirmative[ly]" demonstrate "that each condition as to which the examination is sought is really and genuinely in controversy and that good cause exists for ordering each particular examination." *Id.*

ANALYSIS

The court concludes that it does not have authority under Rule 35 to compel Officers Schulz and Waas to submit to DNA testing. The reasons for this are twofold. First, neither is a party to this lawsuit or otherwise within a party's custody or control and, thus, they fall outside the limited scope of Rule 35. Second, even assuming Rule 35 somehow applies, plaintiff falls short of showing that there is good cause to order the examinations.

A.  **The court lacks authority under Rule 35**

The court does not have authority under Rule 35 to compel either Schulz or Waas to submit to a physical examination unless they are a party to the case or in the custody or under the legal control of a party. Fed. R. Civ. Pro. 35(a)(1). None of those conditions are met.

Schulz and Waas were never added to the case as named parties. Plaintiff attempted to name them in his second amended complaint along with thirty-six other prison staff. Dkt. 28. Ultimately, the court allowed plaintiff to add one John Doe defendant. Dkt. 34. The fact that plaintiff is now seeking to compel information to identify the John Doe perpetrator illustrates the point. *See generally* Dkt. 47.

Plaintiff argues that Waas and Shulz are "parties in substance," citing *Beach v. Beach*, 114 F.2d 479, 481 (D.C. Cir. 1940), but its reasoning does not apply here. In *Beach*, the appellant was a minor suing her husband for maintenance, claiming she was impregnated by him. *Id.* at 480. On the appellee's motion, the trial court ordered the appellant and her child to submit to a blood test to confirm the paternity of the child. *Id.* The court held that, despite suing by her next friend on account of her minority, the appellant and her child were parties to the case under Rule 35 because their interests were "so far represented by others that [their] interest receives actual and efficient protection." *Id.* at 481. By analogizing to this case, plaintiff is putting the cart before the horse. In *Beach*, the appellant and her child were substantially involved in the case *prior* to the Rule 35 blood draw. It was their connection to the litigation that justified the court's order. Here, the opposite is true. Waas and Shulz's involvement is speculative and *depends* on the results of a Rule 35 examination. At this point, before the DNA test, neither has any sufficient connection to the case to be considered a party in substance.

Plaintiff also analogizes to cases in which a court orders a blood test to confirm the paternity of someone suing for wrongful death, Dkt. 58 at 2, but there, the people subjected to the examinations were undisputedly parties to the suits. *See, e.g.*, *Turk v. Mangum*, 268 F. Supp. 3d 928 (S.D. Tex. 2017*); Howell v. Hillcorp Energy Co.*, No. CIV.A. 12-0293, 2013 WL

12

1455758 (E.D. La. Apr. 9, 2013). Plaintiff suggests that, in the cases he cites, "[t]he purported party's . . . status as a party[] depends on the outcome of the paternity DNA test," but a more correct view is to say the party's *standing*, not party status, is in question. *See Howell*, 2013 WL 1455758 at *1 ("Defendants argue that Abigail's standing to seek recovery on either of her causes of action hinges on her falling within the 'class of persons' under Louisiana wrongful death statutes"). Their status as a party only depends on the outcome of a Rule 35 examination insofar as it may prove they do not have standing to bring the claim, resulting in the dismissal of their lawsuit and, consequently, their being a party to it. That is not the case here.[12]

      Plaintiff's argument is against the weight of the authority. Since its inception, courts have applied Rule 35 with care. When Rule 35 was amended in 1970, the amendments included only part of the Advisory Committee's proposal to expand its scope, omitting language that would have expanded it to agents of parties. Given its amendment history and the common law background from which it departs, courts have routinely construed Rule 35's "party" language narrowly, going so far as to hold that parents of child-parties are outside of its reach. *See Caban*, 200 F.R.D. at 179. *Beach*, which plaintiff cites in support, precedes many of these milestones in Rule 35's development and, as discussed above, is inapt besides.

      Underlaying all of this is a concern for the privacy interests at stake. Although a buccal swab is not very physically invasive, the DNA testing that ensues is certainly personally intrusive. The court is wary of creating a policy under which a litigant could seek to compel

---

[12] Generally, plaintiff cites cases where physical examinations are ordered to confirm whether a party should be held liable (e.g., because the defendant husband is not in fact the plaintiff's child's father) or dismissed from the lawsuit for lack of standing (e.g., because they are not children of the deceased and thus cannot make a claim to the estate). Here, plaintiff does not ask for a physical examination to *exclude* people from the lawsuit, but to *include* them. This further illustrates why the request falls outside of Rule 35's purview.

any person to submit to DNA testing as part of civil discovery with only the relatively permissive civil pleading, Fed. R. Civ. P. 8, and nonparty discovery, Fed. R. Civ. P. 45, standards acting as safeguards.[13] Contrast that with the protections afforded in a criminal proceeding, which requires probable cause to issue a warrant for a DNA sample, Fed. R. Crim P. 41(d)(1)—a considerably higher bar than what the court applied at the screening stage in this case, Dkt. 11 at 1, or would have applied had a motion to dismiss been filed, Fed. R. Civ. P. 12(b)(6).

In short, the court must deny plaintiff's motion because the threshold jurisdictional requirement is lacking. The individuals from whom plaintiff seeks DNA samples are not parties to this lawsuit either in name or substance. Moreover, plaintiff has not argued that they are in the custody or under the legal control of a party,[14] and the court will not develop this argument for him.

## B. Plaintiff has failed to show good cause

Even assuming Rule 35 applies to Schulz and Waas, the court would deny plaintiff's motion for lack of good cause. Both sides cite *McGrath v. Nassau Health Care Corp.*, 209 F.R.D.

---

[13] The court considered whether Rule 45 provides plaintiff an alternative route to relief and concludes it does not. The subpoena power granted by Rule 45 allows parties to command a nonparty to "attend and testify; produce designated documents, electronically stored information, or tangible things in that person's possession, custody, or control; or permit the inspection of premises." Fed. R. Civ. P. 45(a)(1)(A)(iii). It does not list physical or mental examinations, and the court views that omission as definitive. This is another way to confirm what is set forth in other parts of the court's analysis—that the court's power to compel physical and mental examinations is limited to Rule 35; and that rule, in contrast to Rule 45, is limited to parties.

[14] Notably, neither the Department of Corrections nor the State of Wisconsin is a named defendant. Even if they had been, due to the lack of developed argument, the court's ruling would not change.

55, 61–62 (E.D.N.Y. 2002) as guidance for applying Rule 35's "good cause" standard to the DNA testing context. Under that guidance, the moving party must show:

(1) the DNA evidence is relevant;
(2) providing a sample will not unduly infringe upon the party's privacy rights; and
(3) a reasonable possibility that the testing will yield a match.

Dkts. 47 at 10 & 53 at 9. Because it could find nothing precedential, the court will follow the parties' lead and apply this three-part framework, with the addition of an initial requirement that the moving party must make a "showing of need" for the DNA testing, as articulated in *Schlagenhauf*, 379 U.S. at 118.

### 1. Need

Rule 35's "good cause" standard requires plaintiff to make a "greater showing of need . . . than under other discovery rules." *Schlagenhauf*, 379 U.S. at 118. Plaintiff has met this initial requirement.

At this point, after years of litigation, the minor-contributor DNA profile recovered from plaintiff's underwear is the only evidence available to plaintiff that may identify the perpetrator of the alleged assaults. There is no eye-witness testimony to develop and no video footage from the time of the alleged incidents. The lack of video footage is particularly poignant because it appears plaintiff used the tools he had at his disposal to alert authorities to the need to promptly preserve the footage from the dates of the alleged incidents. Due to miscommunication or confusion, footage from all possible dates was not preserved. The court takes no position on fault—that was not briefed. But suffice it to say the lack of other evidence makes the DNA evidence all the more important.

### 2. Relevance

Next, plaintiff must show the DNA evidence is relevant. *McGrath*, 209 F.D.R. at 61–62. Plaintiff easily clears this hurdle.

Plaintiff alleges that he was sexually assaulted in his cell by a prison staff member. In support, plaintiff points to a partial DNA profile recovered from his underwear. The partial profile does not match plaintiff, and it could match the alleged perpetrator. So, it is not at all difficult to conclude that comparing DNA profiles of the prison staff members who had access to plaintiff's cell during the relevant timeframes to the partial profile from the underwear could yield relevant information. If a staff member profile was consistent with the partial profile, that would bolster plaintiff's theory of the case. Given that the profile from the underwear was only partial, it would not amount to conclusive proof, but it would make plaintiff's theory more likely. Conversely, if none of the staff member profiles were consistent with the partial profile, that would make plaintiff's theory less likely, perhaps to the point of making the theory unsustainable. This is the very definition of relevance. Fed. R. Evid. 401.

Defendants assert that any DNA evidence is irrelevant because the biological sample from which the minor-contributor DNA was recovered was not semen. Dkt. 53 at 10. This relies on a factually and legally inaccurate theory of sexual assault that the court will not accept. People can and are sexually assaulted in ways that do not involve the transfer of semen. Defendants couch their argument slightly by noting that plaintiff's allegations involving "wetness" and "grease" are consistent with the transfer of semen, *Id.* at 10–15, but this at most goes to the evidentiary weight of a DNA test, not its relevance.

### 3. Privacy rights

Plaintiff must also show that the DNA testing will not unduly infringe upon the officers' privacy rights. *McGrath*, 209 F.D.R. at 61–62. A buccal swab, which involves inserting a cotton swab into a person's mouth to brush the inside of their check, may be minimally *physically* invasive. But that may not mean that it is a minimal invasion of *privacy*. The extent to which a buccal swab done for DNA testing infringes on a person's privacy rights is unsettled in federal courts, owing primarily to ambiguity about whether the analysis centers on the physical intrusiveness of the test or the broader, non-physical implications of collecting information as intimate as DNA.

In *Harris v. Athol–Royalston Regional Sch. Dist. Comm.,* 206 F.R.D. 30, 35 (D. Mass. April 4, 2002), a civil rights retaliation case against a school district, the plaintiff alleged that the defendants anonymously sent a letter containing the plaintiff's personal information to a local news outlet and moved to obtain DNA samples of the defendants to compare to biological specimens recovered from the letter. The court concluded that DNA testing was beyond the scope of discovery in that case because it was "an extreme tool of discovery which is very intrusive to the targets of such discovery," although the court did not explain whether it considered the test *physically* intrusive or intrusive in a less tangible way. *Id.* That same year, the court in *McGrath* "[disagreed] with the *Harris* court's finding," instead siding with a different court's analysis that a cheek swab is "only a minimal intrusion on the party's privacy rights." *McGrath*, 209 F.D.R. at 61 (internal quotations and citations omitted).

This court tends to agree with the *McGrath* court. When considering the purely physical implications of a DNA sample, a buccal swab is among the least invasive and arduous physical examinations, lasting mere seconds and causing virtually no discomfort, unlike a blood

17

draw. There are, as the *McGrath* court noted, other obvious, more philosophical implications inherent in DNA sampling that transcend the actual mechanics of its collection. But all civil discovery is a balancing act weighing society's concern for privacy, liberty, and personal agency against its interest in justice. To that end, courts may enter a protective order limiting the use of the DNA information to the needs of the case, Fed. R. Civ. P. 26(c), which would alleviate, if not entirely mitigate, many privacy concerns.

Given the relevance of the sample in this case, the minimally invasive nature of the collection, and the various protections that can limit the use of any genetic information outside of this case, the court finds that ordering a buccal swab for DNA analysis would not be unduly invasive.

### 4. Reasonable possibility

Finally, to obtain a DNA sample under the *McGrath* factors, plaintiff must show there is a reasonable possibility that the buccal swabs taken from the officers would yield DNA profiles that would match the partial profile recovered from plaintiff's underwear. *McGrath*, 209 F.D.R. at 61–62. Plaintiff stresses that this requires showing only that a match is reasonably *possible*, not reasonably *probable*. Dkt. 47 at 12. Although the court agrees the standard is less demanding than reasonably probable, it cannot be met with conjecture, speculation, or randomness. It is theoretically possible that DNA from *any* human male could match the partial profile at issue until it is shown that it doesn't. But that theoretical possibility does not justify ordering every male in the district to submit to a buccal swab. The analysis must engage to some degree with the likelihood a particular person's DNA would match the partial profile.

18

Plaintiff argues the possibility is reasonable because he has already ruled out any inmates through the CODIS system and identified the two officers who were working third shift on the days he believes he was assaulted. *Id.* at 12–13. Plaintiff concludes that a DNA test is the only way to further refine his search. *Id.*

Plaintiff has shown need and relevance, but that is not the same as showing reasonable possibility of a match. To drill down on this point, the court needs to look at the information plaintiff has gathered, and there isn't much there. Plaintiff identified Officers Schulz and Waas because they were the officers who worked at the prison on September 11 or 12 and October 5—dates plaintiff now asserts correspond to the alleged assaults. Dkt. 47 at 9. But the selection of these dates is tenuous at best. Plaintiff identified the date of the first assault as "on or about" September 11, Dkt. 28 at 9, unable to recall whether it was the morning of the 11th or 12th. Adding to the uncertainty, plaintiff reportedly marked the incident on the calendar after the fact. *Id.* at 10. And plaintiff has alternatively identified the date of the second assault as October 5, the morning of October 6, and "Thursday night October 6th," Dkt. 48-3 at 4. The court understands the difficulty plaintiff has faced in piecing together the facts and sympathizes with plaintiff's plight, but that does not change the limited record. As it stands, the court does not have much confidence that the dates of the alleged assaults have been identified with any degree of certainty.

Because the dates are uncertain, the identification of Schulz and Waas is equally so. When all is said and done, they are simply two prison staff members who happened to work on dates in September and October 2016. There is nothing more to suggest either perpetrated the alleged sexual assaults. Without something more, the possibility that a DNA profile from either Schulz or Waas would match the partial profile recovered from plaintiff's underwear is

more theoretical than reasonable. This theoretical possibility is not reason enough to order Schulz and Waas to submit to an examination.[15]

Accordingly, the court would deny plaintiff's motion on the merits even if it had the jurisdiction to issue the requested order.

### ORDER

IT IS ORDERED that plaintiff's motion to compel discovery under Rule 35, Dkt. 46, is DENIED.

Entered March 6th, 2025.

BY THE COURT:

/s/
_____
ANITA MARIE BOOR
Magistrate Judge

---

[15] Although the court is ruling against plaintiff, it is not because of the strength of defendants' counterarguments, all of which are unpersuasive. First, defendants reiterate the argument that semen was not present on plaintiff's underwear, Dkt. 53 at 18, but, again, lack of semen does not mean no assault could have occurred, so this goes to the weight of the evidence, not its discoverability. They next argue that there is no reasonable possibility of a match because neither Waas nor Schulz is the identical twin of John Wilson, the person whose CODIS profile matched the partial profile. *Id.* at 21. They also argue that plaintiff misapplied the "1 in 14,000" probability when it concluded that there are about 420 people expected to match in Wisconsin because, defendants continue, the 1 in 14,000 figure should have been "applied nationwide." *Id.* These arguments are not responsive to plaintiff's theories, misunderstand the genetic science and probability theory at play, and present factually erroneous conclusions. Finally, defendants argue that neither Waas nor Schulz could be the perpetrator because Waas was not working in the same unit on the nights in question and because plaintiff said he didn't feel he was assaulted during the September incident. *Id.* at 18–19. That Waas was assigned to work in a different unit on the relevant nights does not, on its face, make the possibility that he had contact with plaintiff unreasonable. Defendants' other argument gives too much weight and insufficient context to plaintiff's word choice during his interview with Siedschlag, and, in any event, plaintiff's characterization of the events does not affect the real-life probabilities and possibilities given the physical evidence.